SUPERIOR COURT 
 
 KATHRYN DOWNEY v. EARL JOHNSON and MASSACHUSETTS DEPARTMENT OF STATE POLICE

 
 Docket:
 1884CV01875-C
 
 
 Dates:
 October 1, 2021
 
 
 Present:
 Robert B. Gordon Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS’ MOTIONS FOR SUMMARY JUDGMENT
 
 

 Plaintiff Kathryn Downey (“Downey” or the “Plaintiff”) has brought a three-count Complaint against Defendants Earl Johnson (“Johnson”) and the Massachusetts Department of State Police (“MSP”) (together, the “Defendants”). In her Complaint, Downey charges the Defendants with sex discrimination, in violation of G.L. c. 151B (“Chapter 151B”) and Title VII of the federal Civil Rights Act of 1964 (“Title VII”) (Count I); retaliation, in violation of Chapter 151B and Title VII (Count II); and common law tortious interference with contractual and advantageous business relations, asserted against Johnson only (Count III). The Defendants have now moved for summary judgment as to all three counts, arguing that the undisputed material facts of record demonstrate that Plaintiff has no viable claims and that they are entitled to judgment as a matter of law. Plaintiff concedes the appropriateness of summary judgment as to the tortious interference claim asserted against Johnson in Count III, but contests the Defendants’

-1-

 motions as to her claims for sex discrimination and retaliation. For the reasons which follow, the Defendants’ motions for summary judgment shall be ALLOWED.
FACTUAL BACKGROUND[1]
I. Relationship Between Downey and Johnson
Downey has been employed by MSP for approximately 16 years. In 2013, Downey became an adjunct instructor at MSP’s Training Academy (the “SPA”). Downey was assigned to the SPA as a Defensive Tactics Instructor, and at all times material to this action held the rank and title of Trooper. During the period between May, 2018 until November, 2020, subsequent to the events in issue, Downey earned a series of exam-based promotions in rank. Thus, in May, 2018, Downey was promoted to Sergeant; in April, 2019, Downey was promoted to Lieutenant; and in May, 2020, Downey was promoted to Detective Lieutenant. In November, 2020, Downey sat for the MSP’s Captain’s exam, and believes she will be promoted to the rank of Captain in the near future. Downey’s present lawsuit, however, concerns a series of events which transpired during the period in which she served as an MSP Trooper in the SPA between June, 2016 and October, 2017.
Johnson was hired by MSP in 2004, and assigned to the SPA as a Fitness Coordinator in 2007. In 2012, he became the SPA’s Defensive Tactics Coordinator. In that role, Johnson was responsible for both coordinating the Defensive Tactics curriculum and teaching Defensive Tactics courses. Although Johnson was responsible for determining the nature of the material that Defensive Tactics courses should cover, he did not supervise other Defensive Tactics Instructors (such as Downey) or have the authority to discipline them.

-2-

In January or February of 2015, Downey and Johnson began a consensual romantic relationship that lies at the center of this case. Initially “on and off,” the dating relationship became more serious and committed in or around the beginning of 2016. Downey describes the relationship in the months prior to late June, 2016 as “close,” and she and Johnson cohabitated in her home most of the time during that period. Throughout this time frame, Downey and Johnson were peer SPA colleagues and occupied the same rank within MSP.
II. Downey’s Complaint Against Johnson
On June 27, 2016, Downey entered Johnson’s office at the SPA in order to retrieve some training materials that were stored there. This was not unusual. While in his office, however, Downey discovered a credit card bill among some other papers on Johnson’s desk, and observed that the bill included a charge for a Days Inn hotel stay on May 31, 2016. Downey did not recognize the charge; but she knew that the referenced hotel stay had occurred on a date when Johnson was on active SPA duty during the day, and had spent the night with her in her home. Following this discovery, Downey decided to work an overtime shift at the SPA. Between shifts, Downey drove back to her house and retrieved some personal belongings that Johnson had kept there. 
Later on June 27, while working the overtime shift, Downey took Johnson’s portable electronic hard drive (“EHD”) from his office. Although the EHD was Johnson’s private property, he used it for both personal and work-related purposes. Downey’s stated reason for taking the EHD was to retrieve certain SPA training materials that Johnson maintained on it. Johnson freely allowed co-workers (including Downey) to use the EHD in order to prepare for training sessions. Upon accessing the contents of the EHD at the front desk (where she was then

-3-

working), Downey came upon a folder that contained sexually explicit photographs and videos.[2] These images included Johnson masturbating and performing sex acts with women other than Downey. Downey was extremely upset by what she saw. 
At approximately 6:00 p.m. on June 27, Downey called Johnson (who was not working that day), told him that she wanted to end their relationship, and asked that he give back his key to her house. Johnson drove to the SPA the same evening, and exchanged Downey’s house key for the personal belongings he had been storing at her home. Before he left, Johnson asked Downey if she still had an iPad that she had borrowed from him several months earlier to take on vacation. Downey responded that she thought she had returned it. Johnson replied that he would look for it, and that he would send Downey any vacation photos she had stored on the device if he located it.
On or around July 1, 2016, Downey went on a trip and discovered Johnson’s iPad in her bag. While searching for vacation photographs, Downey observed a great deal of recorded internet activity in which Johnson visited pornographic websites, including one called Adult Friend Finder. Downey researched this particular site on Google, and discovered that it was a web destination designed to facilitate the introduction and meeting of individuals looking to engage in sexual relations. Downey additionally learned from MSP colleagues that Adult Friend Finder is a website known in law enforcement circles to be utilized by prostitutes to solicit customers.
The following week, Downey approached Johnson at the SPA and stated she had questions for him about “what’s been going on.” During their lunch break, the pair met off-site

-4-

 and Downey confronted Johnson with what she had found on his iPad. Johnson thereupon admitted that he visited the Adult Friend Finder website, and showed Downey his user profile to demonstrate that he had only recently signed up to use the site. Later that night, Downey approached Johnson while he was working an overtime shift at the SPA. Johnson appeared distraught, confided that he thought he might be a “sex addict” in need of therapy,[3] and even suggested to Downey that if he did not have a son he might attempt suicide.
Downey subsequently contacted the MSP’s Employee Assistance Unit, and reported that she was concerned about Johnson. At that time, Downey was advised to speak with Lieutenant Colonel Thomas Grenham, and she did so on July 7, 2016. Lieutenant Colonel Grenham asked Downey if she wished to transfer out of the SPA, and Downey stated that she did not. Grenham then advised Downey to put her concerns in writing, which would activate an investigation into the matter; and, on July 12, 2016, Downey submitted a “to/from” letter[4] to Grenham and two other ranking MSP officers with the subject heading “Investigation.”
In her letter, Downey described what she had found on Johnson’s EHD and iPad, stated that Johnson had confirmed he had a profile on Adult Friend Finder, repeated Johnson’s claim that he might be a sex addict, and reported that Johnson may have had a sexual assignation with a woman at a Days Inn during the workday. Downey stated she was initially concerned that if she told anyone within MSP what she had found she “would be viewed negatively,” but ultimately decided to report it because her “work life [was] being affected” and she believed “the safety of others could potentially be involved.” Downey explained that she “didn’t know if

-5-

[Johnson] was saying [he might be a sex addict] to be manipulative, or if he really thinks he has a problem,” but that she was “concerned about any risk of him being unable to control his behavior, particularly because of the close quarter environment of working, and at times living at the SPA, with trainees, student officers, student troopers and others.” Downey added that she was “very apprehensive” about working with Johnson, had been “very anxious going to work,” and was “afraid something might happen, either to him or someone else.” Downey further stated that she was concerned about Johnson’s “capacity for lying,” and expressed concern about both her own health and Johnson’s personal well-being.
On July 21, 2016, MSP assigned Detective Lieutenant Mary McCauley (“McCauley”) to lead an investigation into Downey’s complaint. Later that same day, Downey received a “witness/subject notification and call in letter” regarding this investigation, and contacted McCauley by telephone. McCauley later reported that, during this call, “Downey became quite distraught” and said “that she did not understand how this matter had become an internal affairs investigation as she thought that [her July 12 “to/from” letter] was a confidential communication.” McCauley stated that she then reviewed the process for filing a sexual harassment complaint with Downey, who responded “that she did not feel that Trooper Johnson had harassed her[,] that she currently did not want to file a harassment complaint, but . . . she understood the process if she changed her mind.”[5] Around the same time, MSP temporarily transferred Johnson out of the SPA pending the results of McCauley’s inquiry. 

-6-

The investigation that followed included a search of Johnson’s office, an analysis of his desktop computer, a review of his log-on identifications, email and web activity, and an examination of sexually explicit material that Downey had copied from the EHD and turned over to McCauley. McCauley additionally interviewed Downey on August 9 and 29, 2016, and interviewed Johnson on October 4, 2016. Downey is critical of the McCauley investigation, principally on account of inquiries that it did not undertake. Thus, for example, McCauley does not appear to have asked Johnson why pornographic images were stored on a hard drive that he brought into the SPA and permitted other instructors to access. McCauley likewise interviewed no other troopers in the SPA to determine whether they had viewed Johnson’s pornography or otherwise felt that they had been subjected to a sexually hostile work environment. Finally, McCauley did not investigate to conclusion the suggestion that Johnson had engaged in sexual relations with a woman in a hotel on May 31, 2016 (while on duty), even though Johnson acknowledged it was at least possible that he could have checked into the Days Inn prior to the end of his regular shift on that date.[6] 
On January 13, 2017, McCauley issued a report concluding that Johnson had violated the MSP Information Technology Resources Policy. Johnson’s violations included his failure to log off the network when leaving his desktop computer unattended for extended periods of time, allowance of access to his computer by other employees via his personal user name/password, the connection to his desktop computer of an EHD containing materials “inappropriate” for the

-7-

 workplace, and the storage of shirtless “selfies” of himself on that computer. The investigation relatedly concluded that Johnson had violated MSP’s Information Technology Resources Policy when he connected an EHD device to the police department’s network, knowing such device to contain materials “inappropriate” for the workplace.
The McCauley investigation drew no conclusions regarding Johnson’s threshold decision to bring pornographic material into the workplace (as distinct from his use of MSP IT equipment to store and access the same). The investigation likewise drew no conclusions about Johnson’s activities with adult websites and dating applications, or about whether or not Johnson had committed misconduct by engaging in sex acts at a hotel while on duty. Finally, the McCauley investigation summary did not address whether Johnson’s conduct at the SPA had created – for Downey or anyone else – a sexually hostile work environment.[7]
On or around March 30, 2017, and following a meeting with Johnson, MSP Major David Otte reviewed McCauley’s investigation summary and recommended to Lieutenant Colonel Grenham that the reported charge of misconduct against Johnson be sustained and that Johnson be permanently transferred from the SPA. Johnson thereupon received a formal letter of reprimand, and was reassigned out of the SPA effective April 23, 2017. There is no evidence in the record of any problematic interactions between Downey and Johnson from and after the date Downey lodged her initial complaint with MSP. Nor is there evidence in the record that, at any time between April and November of 2017 (when she filed her charge of discrimination with the

-8-

 MCAD), Downey communicated any dissatisfaction to MSP regarding the handling of her internal complaint.  
III. Johnson’s Complaint Against Downey
On April 21, 2017, within days of learning the disciplinary results of the McCauley investigation, Johnson initiated a formal complaint against Downey via a “to/from” letter to Lieutenant Colonel Grenham. This complaint concerned an incident that had occurred during Taser training in March of 2016, more than a year prior. In his letter, Johnson described a situation that had taken place following a Taser training session in an MSP gymnasium. The MSP had recently introduced Tasers, a new weapon to be used by law enforcement in the field, and Downey, Johnson and two other SPA troopers (Steven Wohlgemuth and David Lahair) had been certified as Taser Instructors. SPA Taser Instructors were provided with both live (black) and inert (blue) Taser cartridges for use in training exercises. Live cartridges had copper wire to conduct electricity and longer barbs to penetrate a target when fired upon. Inert cartridges, by contrast, used fishing line instead of wire, did not conduct electricity, and had shorter barbs than live cartridges. Nonetheless, even inert cartridges carried some risk of injury; and, for this reason, they were only used during training sessions on individuals wearing protective suits and eye gear, and never without prior consent. 
According to Johnson’s letter, following a late-March, 2016 training session, he, Downey, Wohlgemuth and Lahair were engaged in a light-hearted discussion about whether trainers should subject one another to a Taser discharge in “drive stun” mode.[8] In the course of this discussion, Downey withdrew her Taser from its holster and pointed it at Johnson. Johnson alleged that he repeatedly asked Downey not to discharge the weapon, but that Downey

-9-

 nonetheless proceeded to shoot him with her Taser from approximately ten feet away. Unbeknownst to Johnson, the Taser cartridge that discharged from Downey’s weapon, although black in color, was in fact inert. The Taser probe struck Johnson in the hip and abdomen area and, according to Johnson, caused bruising. Johnson was not wearing protective equipment or eye gear at the time, and Downey knew that these were among the protective precautions required to be taken when discharging Tasers during training sessions.
Johnson explained that he had not reported Downey’s misuse of the Taser earlier, because he did not wish to place the Taser program in jeopardy with a publicly disclosed and unflattering incident of this nature. Johnson also reported that, at the time, he felt he worked closely enough with Downey (with whom he still shared a romantic relationship) that he could impress upon her the wrongfulness of her conduct, monitor her actions and judgment going forward, and prevent similar episodes from occurring in the future. Since leaving the SPA, however, Johnson claimed he had become aware of Downey exhibiting “erratic behavior” such as “mood swings, emotional outbursts, and verbal arguments with fellow instructors,” and had on occasion personally observed such “volatile behavior” displayed by Downey. For these reasons, Johnson declared in his complaint that he felt compelled to surface the Taser incident to MSP management. Johnson wrote: “If Trooper Downey were to have another incident like the one perpetrated on me, I would feel at least partly responsible for any injuries or damages that might result.”
Johnson’s complaint was investigated by Internal Affairs Detective Lieutenant Carla Pivero (“Pivero”). Pivero interviewed Downey, Johnson and their fellow SPA Taser Instructors, and additionally reviewed Taser activity records and related documentation. Pending the

-10-

 outcome of this investigation, Downey, Wohlgemuth and Lahair were all prohibited from teaching Defensive Tactics.
During the investigation, Johnson informed Pivero that, in addition to submitting an internal complaint, he had contacted Axon, the company that certifies Taser instructors, in order “to inquire what their process is for reporting these incidents to them.” Johnson maintained that it was not his goal to have Downey’s certification rescinded; but if Axon had asked him how he thought it should respond to Downey’s conduct, terminating her certification would have been his “recommendation.”
Downey alleged to Pivero that the Taser incident was a “prank” she had planned with Wohlgemuth and Lahair. According to Downey, Wohlgemuth had shown her how he altered the blue inert cartridges to look like live, black ones, and then provided her with one of the altered blue cartridges for the “specific purpose of Tasing Trooper Johnson.”9 Downey further claimed that, right before she shot Johnson with the altered cartridge, Johnson had raised his own Taser and pointed it at her. Downey nonetheless took “full responsibility” for the improper deployment of her weapon against an unprotected colleague, and declared that she would never do this again.
For their part, Wohlgemuth and Lahair both denied to Pivero that they had been involved in planning the prank, and further denied that they had observed Johnson draw his Taser and point it at Downey. Wohlgemuth did admit that he had altered several blue (inert) cartridges by “pull[ing] the cartridge apart” and breaking off their probes. He explained that the process was “actually kind of a pain in the butt,” because breaking the probes caused the fishing line inside

-11-

 the cartridge to fall out and he had to put it back in before he could reassemble the cartridge.10 Wohlgemuth maintained that he had altered the cartridges in order to create a training scenario in which students would have to respond to the unexpected failure of a Taser cartridge to adhere to a target. Breaking the probes was the only way to ensure that the inert cartridges bounced off of a target during training scenarios. Wohlgemuth expressly denied ever furnishing one of the altered cartridges to Downey.[11] There was, therefore, no direct evidence as to how Downey came to be in possession of one of the altered cartridges, and how she knew the particular cartridge in her holstered Taser had been rendered inert, other than Downey’s own statement to Pivero that Wohlgemuth had provided her with one of the altered cartridges. Once again, Wohlgemuth flatly denied this allegation.
Downey, Lahair and Wohlgemuth all told Pivero that everyone who was present during the Taser incident—including Johnson—had laughed together about the incident. Both in real time and thereafter. All three witnesses reported that no one expressed upset, concern or alarm, and no one regarded the episode as one involving “workplace violence.” Johnson displayed no injury of any kind, and never spoke of bruising to his trooper peers in the SPA.[12] Moreover, the relationship between Downey and Johnson appeared to be “healthy and strong” in the days and weeks that followed, and there was no indication that what had occurred with the Taser had

-12-

caused any adverse change to it. Johnson continued to joke about the incident with his colleagues, and to carry on a romantic relationship with Downey through late June, 2017. Downey and Wohlgemuth both expressly asserted to Pivero that they believed Johnson had brought the entire incident forward (a matter they viewed as harmless hijinks among co-workers) in retaliation for Downey having surfaced the matter of Johnson’s sex-related misconduct a year prior.
On September 12, 2017, Pivero issued her investigative report. 102 single-spaced paragraphs in length, the report concluded that Downey had deployed her Taser against an unprotected Johnson and thereby committed serious misconduct. In the report, Pivero stated that she found Wohlgemuth and Lahair to be credible witnesses, and noted that they had answered her questions in an “honest” and “forthright” manner and provided consistent accounts of what transpired. By contrast, Pivero discounted Downey’s credibility insofar as Downey had asserted that she pre-planned the Taser incident with Wohlgemuth and Lahair and that Johnson had pointed his own Taser at her first. Pivero found that there was no evidence to support Downey’s contentions in this regard, other than Downey’s own “uncorroborated and disputed testimony.” 
Pivero additionally found that Wohlgemuth had altered two or three cartridges for special “scenario training including the use of the training suit,” and had “spent a substantial amount of time preparing these cartridges and broke one in the process.” Pivero noted that it was impossible to determine conclusively whether Downey had shot Johnson with one of the cartridges Wohlgemuth had altered (as opposed to another inert cartridge that had merely been altered to have a black top). Nevertheless, Pivero found that, even if Downey had used one of Wohlgemuth’s cartridges, it would not change her finding that Wohlgemuth had not intentionally

-13-

 given an altered cartridge to Downey and that he did not have any “way of knowing how Trooper Downey got [one of his] cartridge[s] or what she was planning to do with it.” 
The report further concluded that Johnson had improperly shared his complaint about Downey outside of the MSP chain of command (with Axon, MSP’s Taser vendor), and thereby committed misconduct of his own. With respect to Downey’s charge of retaliation, however, Pivero concluded that, while the timing of Johnson’s complaint was “suspect,” the evidence was inconclusive as to Johnson’s motives and would not sustain the charge.
Pivero’s report and recommendation were forwarded to MSP Major David Otte. Upon review of same, on October 16, 2017, Major Otte determined that there “are still differences of opinion and unresolved questions that revolve around whether the Taser deployment was intended as a prank or an assault, and the resultant level of seriousness of this act. Nevertheless, deploying a modified Taser cartridge against an unwilling subject without the proper protective equipment in this manner is an inherently unsafe activity, and cannot be overlooked.” Otte continued that Downey had committed a “serious safety violation,” had done so with “premeditat[ion],” and that severe injuries and potentially criminal charges could have resulted. Otte concluded that it was “unacceptable for the recipient of a Department-issued Taser to engage in an unauthorized deployment such as this,” just as it is “unacceptable for a member assigned to the Academy to engage in unsafe conduct with Department issued use-of-force equipment for frivolous reasons.”    
Regarding Downey’s charge of retaliation, Major Otte inferred that the timing of Johnson’s filing of his complaint against Downey – close on the heels of the discipline administered to Johnson in respect of the inculpatory information Downey had brought forward about him – was “more than highly suspect.” Nevertheless, Otte concurred with Pivero that the

-14-

 charge of retaliation should not be sustained, as the evidence was insufficient to establish that a retaliatory motivation was the “sole” or “main” reason Johnson had filed his complaint. Although Otte thoughtfully observed that “it seems likely that retaliation against Trooper Downey, for whatever personal reasons, played some part in the decision and timing of his complaint,” he in all events concluded that this fact did not alter the discipline-worthiness of Downey’s misconduct. Faced with the serious allegations contained in Johnson’s complaint, and however suspect Johnson’s personal motivations may have been in bringing such complaint forward, MSP “had a clear obligation to investigate this matter and take immediate corrective action.” MSP had been informed of “an alleged assault by Taser and misuse of use-of-force equipment,” and discipline against Downey for her demonstrated offense was undeniably warranted.  
Major Otte recommended that, under all of the circumstances presented, Downey should receive discipline at a level at or below departmental guidelines. Among the more salient considerations in this recommended leniency were the fact that the incident was laughed off at the time by those directly involved, that Johnson had delayed his complaint more than a year (thus compromising MSP’s ability to investigate the matter), that Downey had no prior disciplinary history in her 13 years on the force, and that Downey had forthrightly acknowledged her error. Accordingly, although MSP guidelines indicated that Downey’s offense merited a 5 to 30 day suspension from duty, Downey received only a letter of reprimand and a reassignment out of the SPA.  
Major Otte next averred that all MSP employees have a duty to report workplace violence to their immediate supervisor.[13] Otte noted that he had discussed the Taser incident with MSP’s

-15-

Workplace Violence Coordinator, and was of “the opinion that the tasing of Trooper Johnson, as perceived by him and as described in his [complaint], would fall into the category of Workplace Violence, and is an incident that he should have reported immediately to the Workplace Violence Coordinator.” Nevertheless, Otte determined that he “would mitigate any discipline” to Johnson for not immediately reporting the incident, because Johnson was the victim in this case.
Major Otte also determined that Johnson had improperly shared his complaint against Downey outside of the MSP chain of command, in violation of departmental policy. Otte stated that, even though MSP’s disciplinary guidelines recommended a 1 to 15-day suspension for such a violation, “Johnson is the victim . . . in this case and even though his complaint may contain an element of retaliation for personal reasons, it brought a matter of concern to [MSP’s] attention.” Otte thus recommended limiting Johnson’s discipline to a filed letter of reprimand.
Neither Wohlgemuth nor Lahair received formal discipline for their supposed role in the Taser incident. On account of the fact that both of these troopers perceived the event to be in the nature of an unserious prank between individuals who were then in a romantic relationship, Major Otte found that Wohlgemuth and Lahair did not have a duty to report the incident under MSP’s Workplace Violence Policy. Nevertheless, their behavior reflected a failure to appreciate the importance of safety protocols in the handling of use-of-force equipment, and the need for the reporting of safety violations by responsible employees. Both, therefore, received a non-disciplinary letter of counseling regarding the proper reporting of workplace violence. 
Downey appealed her discipline to MSP’s Trial Board, which held a hearing in October, 2018. During this hearing, Downey, Johnson, Pivero, Lahair, and Wohlgemuth all testified about the Taser incident and the subsequent investigation thereof. The four percipient witnesses to the

-16-

 incident provided testimony that was largely consistent with the statements they had made to Pivero during her original investigation. When she was asked to describe what had happened, Downey testified, in relevant part, as follows:
“Trooper Wohlgemuth and I were talking in the hallway and he told me that he had modified a training cartridge. And he showed me, not in the way that he showed me the exact process that he went through, but he had the cover off of it when he showed it to me and said he had switched—the cartridge was a blue one to start with, but he had taken the blue one off and then he had a black cover to put on it . . . .I don’t remember any great detail about the exact process of it but he suggested that it would be a great prank to play on Earl Johnson and I thought it would be funny. I thought it was a good idea and he didn’t talk me into doing it and I just said I’ll do it, that sounds funny. . . . [A]t some point during the training day we told Trooper Lahair about it and Trooper Lahair was not going to miss that if that happened so he just wanted to make sure that he was going to be there. He didn’t have any part of actually planning it or anything . . . .”
On December 3, 2018, the Trial Board found Downey guilty of violating MSP Rule 5.8.2, “Unsatisfactory Performance,” on account of her improper deployment of a Taser. In its ruling, the Trial Board found that Downey “did fail to conform to the work standards established for the member’s rank, title or position; and/or did fail to take appropriate action on the occasion of a crime, disorder, or other condition deserving of State Police attention.” Based on this guilty finding, the Trial Board recommended that Downey be issued a written reprimand and “not be permitted to instruct defensive tactics and specifically electronic controlled weapons for a period of time determined by the Colonel.” The Trial Board’s decision also recommended that the Superintendent depart from MSP disciplinary guidelines, based on the fact that Downey had taken responsibility for what had happened, Johnson’s “unreasonable delay” in reporting the incident, the fact Downey had already been transferred from the SPA, and because “the incident was a prank and not an egregious safety issue.”
MSP Superintendent Kerry Gilpin subsequently adopted the findings of the Trial Board, apart from its conclusion that the Taser incident “was a prank and not an egregious safety issue.”

-17-

 Superintendent Gilpin also declined to adopt the Board’s recommendation that Downey be barred from serving in instructional positions involving defensive tactics and electronically controlled weaponry.
IV. The Grenham Rumor
On September 25, 2017, Downey submitted a letter to MSP Colonel Richard McKeon and a Lieutenant Colonel Hughes, alleging that she had become the victim of a circulating rumor to the effect that she and Lieutenant Colonel Grenham were involved in an improper sexual relationship. Downey believed Johnson to be the source of this rumor, given her history with him, and so stated during an ensuing meeting with MSP Captain Brian Moran and Captain Lee Gullage. During this meeting, however, Downey provided no names of any individuals from whom she had actually heard the rumor, and no names of any individuals whom she believed to be involved in spreading it. Nor did Downey furnish information about the media that had purportedly reached out to her legal counsel regarding this matter.
During deposition, Captain Moran testified that “identifying one particular person” to focus an investigation on “based on nothing more than a supposition . . . was a major concern” to Major Otte and him, because MSP employees are represented by attorneys and entitled to a “target letter” when they are the focus of an investigation. Moran explained that the target letter must cite a reasonable premise as to why an individual is being investigated; and, without any concrete information about who was circulating the claimed rumor, Major Otte and he had “very grave difficulty arriving at what that [premise] might be.” Moran stated that there was also “a lot of discussion” around sending a questionnaire about the rumor to all 2000 MSP employees; but it was decided that doing so would only further spread the rumor and exacerbate any negative consequences from it. Captain Moran and Major Otte thus “chose an interim course.” They

-18-

 performed an extensive data-mining email search of the MSP computer network to which they had access, attempting to identify sources of the rumor Downey believed to exist. Notwithstanding such efforts, these officers found no evidence related to the alleged rumor or its originator.[14]
Downey’s September 25 letter regarding the Grenham rumor was submitted outside of her chain of command, in violation of MSP policy.[15 Downey thus received a “negative supervisory report” for failing to observe proper reporting procedure. Although such a supervisory report is part of the MSP’s personnel evaluation system, it does not appear to qualify as formal discipline.
DISCUSSION
I. Standard of Review
“Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.” Helfman v. Northeastern Univ., 485 Mass. 308, 314 (2020) (quoting Godfrey v. Globe Newspaper Co., 457 Mass. 113, 118-19 (2010)). “The moving party bears the burden of demonstrating the absence of a triable issue of fact on every relevant issue.” Scholz v. Delp, 473 Mass. 242, 249 (2015). The moving party may satisfy this burden by submitting affirmative evidence negating an essential element of the opposing party’s case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of her case at trial. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

-19-

Once the moving party establishes the absence of a triable issue, “the nonmoving party must respond and make specific allegations sufficient to establish a genuine issue of material fact.” Barron Chiropractic & Rehab., P.C. v. Norfolk & Dedham Grp., 469 Mass. 800, 804 (2014). “Bare assertions made in the nonmoving party’s opposition will not defeat a motion for summary judgment.” Id. Accord Mass. R. Civ. P. 56(e) (“A party may not rest upon the mere allegations or denials of his pleading.”).
“In deciding whether summary judgment is appropriate, a judge considers evidence presented in the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits.” O’Connor v. Redstone, 452 Mass. 537, 550 (2008) (citing Mass. R. Civ. P. 56(c)). The Court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. See Psychemedics Corp. v. Boston, 486 Mass. 724, 731 (2021) (quoting Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991)); O’Connor, 452 Mass. at 550.
II. Merits of Plaintiff’s Claims
A. Sex Discrimination (Count I)
Downey avers that MSP is liable under G.L. c. 151B and Title VII for discriminating against her on the basis of sex. See G.L. c. 151B, § 4; 42 U.S.C. § 2000e-2. In support, Downey contends that MSP: (1) failed to sufficiently investigate and remediate alleged sexual harassment to which she was subjected by Johnson, and (2) subjected her to disparate disciplinary treatment relative to her male co-workers. The Court will address each aspect of Downey’s discrimination claim in turn.

-20

i. Sexual Harassment
a. Legal Definition
Chapter 151B and Title VII delineate two forms of actionable sexual harassment. The first, quid pro quo sexual harassment, occurs when submission to or rejection of an offender’s “sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature” is made an express or implied condition of job retention or employment-related benefits. G.L. c. 151B, § 1(18); 29 C.F.R. § 1604.11(a). See Gerald v. University of Puerto Rico, 707 F.3d 7, 20 (1st Cir. 2013) (quid pro quo sexual harassment typically occurs “when a supervisor uses his superior position to extract sexual favors from a subordinate and, if rebuffed, retaliates by taking action that adversely impacts the subordinate’s employment”). The second form, known as hostile work environment sexual harassment, occurs when an offender’s “sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature” has the “purpose or effect of unreasonably interfering with an individual’s work performance” by creating “an intimidating, hostile, humiliating or sexually offensive work environment.” G.L. c. 151B, § 1(18); 29 C.F.R. § 1604.11(a). Only the latter species of sexual harassment is alleged in the present case.
“A sexually hostile or offensive work environment is one that is ‘pervaded by harassment or abuse,’ resulting in ‘intimidation, humiliation, and stigmatization’ that poses a ‘formidable barrier’ to the plaintiff’s full participation in the workplace.” Gyulakian v. Lexus of Watertown, Inc., 475 Mass. 290, 296 (2016) (quoting Pelletier v. Somerset, 458 Mass. 504, 523-24 (2010)). Whether a plaintiff has been subjected to a sexually hostile environment “must be assessed ‘in light of the record as a whole and the totality of the circumstances[,]’” Morrison v. Carleton Woolen Mills, 108 F.3d 429, 437 (1st Cir. 1997) (quoting Meritor Sav. Bank, FSB v.

-21-

Vinson, 477 U.S. 57, 69 (1986)), “which ‘may include the frequency of the discriminatory conduct; its severity; [and] whether it is physically threatening or humiliating or a mere offensive utterance . . . .’” 15 LaGrange Street Corp. v. Massachusetts Comm’n Against Discrimination, 99 Mass. App. Ct. 563, 572 (2021) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)). Accord Dahms v. Cognex Corp., 455 Mass. 190, 201 (2009). 
b. Downey’s Hostile Work Environment Claim
Downey argues that Johnson created a sexually hostile work environment by bringing a hard drive to work that contained pornography, by engaging in sex acts with a civilian at a hotel while he was on-duty, and by admitting to her that he had used a website to meet strangers for sex and might in fact be a sex addict. As will be explained below, these behaviors do not permit a reasonable finding that Johnson subjected Downey to a sexually hostile work environment, both because they lack a sufficient nexus to Downey’s workplace and because they are not so pervasive or severe that a reasonable person would find them objectively offensive.[16]
1. Nexus to Downey’s Workplace
The Court acknowledges that Johnson was insensitive, careless and even boorish to preserve evidence of his interest in pornography and sexual liaising with other women on a computer to which Downey, his girlfriend, had access. Nevertheless, it is difficult to see how this amounts to workplace sexual harassment committed against Downey within the meaning of what is prohibited by Title VII and Chapter 151B. It is true that the law of sexual harassment cannot

-22-

always draw bright lines between what occurs inside and outside of the workplace. See Parrish v. Sollecito, 249 F. Supp. 2d 342, 351 (S.D.N.Y. 2003) (“The employment relationship . . . comprises multiple dimensions of time and place that cannot be mechanically confined within the precise clockwork and four walls of the office.”). But to be cognizable as sexual harassment in employment, the legal purview of Title VII and Chapter 151B, sexual insensitivity by one individual toward another must in some material sense concern and affect the workplace. See Andersen v. Rochester City Sch. Dist., 481 Fed. Appx. 628, 630 (2d Cir. 2012) (although presence of student in school building who purportedly harassed teacher outside of school “may have been distressing” to the teacher, “no reasonable jury could find that his entirely out-of-school conduct had the effect of permeating [the teacher’s] workplace”); Bottenberg v. Carson Tahoe Hosp., 2007 U.S. Dist. LEXIS 109935, at *9 (D. Nev. 2007) (defendant entitled to summary judgment on plaintiff’s sexual harassment claim where “most of the incidents of harassment did not occur at work”). The simple fact of the matter is that, on the present record, what happened between Downey and Johnson cannot fairly or plausibly be characterized as workplace sexual harassment. The mere fact that the two protagonists in this case happen to share the same employer will not, standing alone, suffice to convert offensive behavior unrelated to work and carried on outside of work into actionable sexual harassment under Title VII or Chapter 151B. 
To the extent that Downey’s workplace became uncomfortable for her, this appears to be entirely a function of the fraught circumstances surrounding the break-up of her romantic relationship with a co-worker. But the actions by Johnson that precipitated this break-up took place almost entirely outside the confines of their shared workplace at MSP. That is, Johnson engaged in sexual relations with other women, had a weekday tryst in a hotel with another

-23-

woman, utilized internet dating applications to arrange sexual liaisons, and surfed the web for pornographic images and videos that he chose to retain on a personal hard-drive. Although Downey was understandably disturbed by these facts (she was, after all, in what she thought was a committed relationship with Johnson), and may well have found it difficult to work alongside him in these circumstances, it cannot fairly be said that Johnson harassed her in the MSP workplace or created a sexually hostile environment for her at the SPA.[17] See Yuknis v. First Student, Inc., 481 F.3d 552, 555 (7th Cir. 2007) (noting the importance of context when assessing conduct alleged to create sexually hostile workplace). Johnson betrayed an intimate relationship he had with Downey; but he did not speak of it at work, demean Downey in an openly observed way, or involve other co-workers in their personal affairs in any manner. Downey’s discomfort had virtually nothing to do with the MSP, and everything to do with a hurtful betrayal of a private relationship carried on outside of work. This is simply not the stuff of actionable sexual harassment under Title VII or Chapter 151B, and the cases so hold. See Leibovitz v. New York City Transit Auth., 252 F.3d 179, 189-90 (2d Cir. 2001) (to allow plaintiff to proceed with hostile environment claim based on conduct that occurred outside of plaintiff’s workplace would impermissibly expand “the concept of environment to include venues in which she did not work” and thereby “open the door to limitless employer liability”); Whipple v. Reed Eye Assocs., 2021 U.S. Dist. LEXIS 42962, at *26-27 (W.D.N.Y. 2021) (although incidents that occurred outside of work may provide context for incidents occurring at work, “they cannot, in themselves, give rise to [a hostile work environment claim]; what matters in the end is the plaintiff’s work environment”); Kohutka v. Hempstead, 994 F. Supp. 2d 305,

-24-

 325 (E.D.N.Y. 2014) (“[A]s a general proposition, employers are not responsible . . . for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-employees.”) (citation omitted). Cf. Montoya v. America Online, 2009 U.S. Dist. LEXIS 148120, at *10 (D.N.M. 2009) (“[W]hile Title VII prohibits discrimination, a plaintiff cannot turn a personal feud into a sex discrimination case, and the plaintiff’s gender, rather than her former intimate place in the harasser’s life, must cause the harassment.”) (internal quotation marks and alterations omitted). The absence of sufficient nexus between Johnson’s behaviors and Downey’s workplace, standing alone, defeats the viability of Plaintiff’s sexual harassment claims.
2. Severity and Pervasiveness
The only connection that any of Johnson’s behaviors had with MSP, beyond the fact that Johnson and Downey were fellow troopers in its Academy, was the fact that Downey happened to discover the offending pornography during a search of Johnson’s portable hard-drive at work. However, actionable sexual harassment requires that offending conduct be sufficiently “severe and pervasive to interfere with a reasonable person’s work performance.” Muzzy v. Cahillane Motors, 434 Mass. 409, 411 (2001). “This ‘objective,’ reasonable person standard has been interpreted to mean that the evidence of sexual harassment is to be considered from the ‘view of a reasonable person in the plaintiff’s position.’” Id. at 411-12 (quoting Ramsdell v. Western Mass. Bus Lines, Inc., 415 Mass. 673, 677-78 n.3 (1993)); see also Faragher v. Boca Raton, 524 U.S. 775, 787 (1998) (citing Harris, 510 U.S. at 787) (to be actionable under Title VII, “a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so”).

-25-

The facts of the present case, unsavory though they are, plainly fail to meet the statutory standard of severity or pervasiveness. It is certainly true, as Plaintiff argues, that “pornography displayed in the workplace, even if not directed to one individual specifically, may contribute to a hostile work environment for women generally.” Williams v. CSX Transp. Co., 533 Fed. Appx. 637, 641 (6th Cir. 2013) (citation omitted). But bringing a personal hard drive that happens to contain pornography into work is not—without much more—severe and pervasive conduct that would interfere with a reasonable person’s job performance. See Williams, 533 Fed. Appx. at 641-42 (collecting cases and noting that, to create a genuine issue of material fact, plaintiff must present evidence of “additional conduct more severe or pervasive” than an occasional display of pornography); see also Yuknis, 481 F.3d at 555 (noting that it was not “any of the plaintiff’s business what [her] manager was looking at” on his office computer; that it was “not as if pornographic pictures were exhibited on the walls of the workplace or emailed to the plaintiff”; and that the relationship between plaintiff’s manager watching pornography on his office computer “and the plaintiff’s working environment was almost as attenuated as if [plaintiff] had learned that [her manager] watches pornography on his computer at home,” and thus did not create a sexually hostile work environment). 
The record in this case is devoid of any evidence that Johnson displayed pornography for others to see, viewed it so that others could overhear it, or otherwise discussed it with colleagues at work. Once again, what Johnson did in this case (viz., storing pornographic images on a computer drive) does not, by itself, rise to the level of sexual harassment in the workplace. Compare Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 270-72 (6th Cir. 2009) (issue of fact as to whether work environment was hostile where there was pornography displayed in workplace, and where coworkers routinely discussed their personal sexual exploits

-26-

 and referred to women using derogatory terms); Fairbrother v. Morrison, 412 F.3d 39, 44 (2d Cir. 2005) (coworkers repeatedly showed plaintiff pornography and solicited her opinion of same, posted explicit jokes on bulletin board, talked about their sex lives, and called plaintiff a “bitch” and a “whore”); Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1498 (M.D. Fla. 1991) (in addition to pornography being visible, plaintiff’s coworkers frequently discussed pornography and regularly subjected her to sexual remarks and verbal taunting).[18]
The record likewise lacks evidence that Johnson ever subjected Downey to any inappropriate or harassing conduct after she discovered and confronted him about his pornography collection. Indeed, Downey testified that, after she revealed what she knew to Johnson, her contact with him was “minimal.” The conduct at issue, therefore, can in no way be characterized as “pervasive.” See Kimball v. Village of Painted Post, 737 Fed. Appx. 564, 569 (2d Cir. 2018) (plaintiff’s testimony identifying “only two specific instances in two years in which she discovered evidence suggesting that other officers were viewing pornography” on workplace computers did not support inference that conduct at issue was pervasive or “provide[] an adequate basis for a reasonable jury to find a hostile work environment”). See also Faragher, 524 U.S. at 788 (“isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment”) (internal quotation marks omitted); Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83-84 (1st Cir. 2006) (record did “not provide a sufficient basis from which a reasonable fact finder could conclude that [plaintiff] was subjected to a hostile work environment,” where the “alleged harassing conduct, while certainly

-27-

crude, comprised only a single incident”). Compare Gyulakian, 475 Mass. at 296 (jury could infer that daily, unwanted sexual attention over a period of eighteen months was sufficiently pervasive to alter conditions of plaintiff’s employment); Billings v. Grafton, 515 F.3d 39, 47-50 (1st Cir. 2008) (conduct at issue held sufficiently pervasive where supervisor repeatedly stared at female employee’s breasts over course of several years); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir. 2002) (finding pervasive conduct where plaintiff was subjected to “harassment on a daily basis, including humiliating sexual remarks and innuendos,” for over a year).
To be sure, “[t]he point at which a work environment becomes hostile or abusive does not depend on any ‘mathematically precise test.’” Billings, 515 F.3d at 48 (quoting Harris, 510 U.S. at 22)); see also Gnerre v. Massachusetts Comm’n Against Discrimination, 402 Mass. 502, 507-08 (1988) (citing College-Town, Div. of Interco, Inc. v. Massachusetts Comm’n Against Discrimination, 400 Mass. 156, 162 (1987)) (noting lack of quantitative requirement to render incidents of sexual harassment actionable). “[I]solated incidents may, ‘if egregious enough, suffice to evince a hostile work environment.’” Ponte, 741 F.3d at 420 (quoting Noviello v. Boston, 398 F.3d 76, 84 (1st Cir. 2005)). In the present case, however, there is no evidence of egregiousness such as might convert an otherwise isolated episode into actionable harassment. Downey has acknowledged that Johnson did not intend for her to discover the pornography stored on his personal EHD; and the evidence of record is clear that Downey only did so by taking it upon herself to examine papers on Johnson’s desk and open clearly marked files on his drive other than the training materials she claimed to be looking for in connection with work. Following her discovery, Downey did not file a sexual harassment complaint pursuant to MSP policy; nor did she claim that she felt sexually harassed during the McCauley investigation. Ponte, 741 F.3d at 320 (plaintiff’s failure to describe behavior as “sexual harassment” when she

-28-

 complained about it to employer evinced lack of severity). Downey has thus failed to demonstrate that her one-time discovery of Johnson’s pornography collection and infidelity was so egregious as to clear the hostile environment hurdle. See Coolidge v. Consolidated City of Indianapolis, 505 F.3d 731, 734 (7th Cir. 2007) (incident where employee briefly viewed pornography was “not particularly severe” under Title VII); Yuknis, 481 F.3d at 553 (employee’s complaints that coworkers had extra-marital affairs, watched pornography, and told vulgar jokes may have offended plaintiff, but were insufficient to establish hostile work environment); Fonseca v. Secor Int’l, Inc., 247 Fed. Appx. 53, 54-55 (9th Cir. 2007) (the fact that defendant had unintentionally exposed plaintiff to pornography did not create hostile work environment as a matter of law); Pomales, 447 F.3d at 84 (noting that “successful single-incident claims typically have involved unwanted physical contact”); Ott v. AirTran Airways, 2010 U.S. Dist. LEXIS 31208, at *21-22 (E.D. Wis. 2010) (plaintiff’s contention that she briefly saw images of naked women on a coworker’s computer screen on three to five occasions was “weak evidence in support of her hostile work environment claim”).
Even assuming, arguendo, that Johnson’s behaviors had a cognizable connection to the MSP workplace, aside from Johnson’s admissions to Downey, there is no evidence that any of the conduct at issue was ever directed at her, or involved the type of overtly offensive behavior (such as unwelcome physical contact, sexual propositioning, and/or sexist jokes or comments) that is typically at the heart of a hostile work environment claim. See Howard v. Cook Cnty. Sheriff’s Office, 989 F.3d 587, 603 (7th Cir. 2021) (“ambient” or indirect harassment is rarely sufficient to support hostile work environment claim). Johnson only informed Downey that he had used the internet to meet strangers for sex, and thought that he might be a sex addict, in an apparent effort to explain himself to a paramour who was upset about what she had discovered

-29-

 about his extra-relationship activities. Indeed, Downey acknowledged to McCauley that when she saw Johnson at work for the first time following her discovery of his pornography, she became upset due to “the whole personal trauma of the whole thing,” and then proceeded to send Johnson text messages throughout the day asking him questions about their relationship. Johnson only admitted to having sex with people he met on the internet, and to possibly being a sex addict, a week later, when Downey confronted him about his internet history. The highly personal context of these revelations thus belies the notion that Johnson’s conduct was so objectively offensive that it would have interfered with a reasonable person’s work performance. See Yuknis, 481 F.3d at 555.
Taking all matters together, and even considering them in the light might favorable to the Plaintiff, the Court concludes that no reasonable jury could find that Johnson’s conduct was so severe and pervasive as to have altered the conditions of Downey’s job performance or subjected her to a sexually hostile work environment. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (Title VII not intended to be a “general civility code” for the workplace); Ponte, 741 F.3d at 320 (whether conduct made plaintiff uncomfortable was “not the test” as to whether the conduct created a sexually hostile work environment); Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 977 (7th Cir. 2004) (quoting Rogers v. Chicago, 320 F.3d 748, 752 (7th Cir. 2003)) (“Not every unpleasant workplace is a hostile environment. . . . The workplace that is actionable is one that is hellish.”); Suarez v. Pueblo Int’l, Inc., 229 F.3d 49, 54 (1st Cir. 2000) (“The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins—thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world.”). Plaintiff’s sexual harassment claims thus fail as a matter of law.

-30-

c. Employer Liability
Assuming, arguendo, that Johnson did subject Downey to a sexually hostile work environment, and in view of the fact that there is no evidence that Johnson possessed supervisory authority over Downey such as will permit the imposition of vicarious liability on this employer, MSP can only be liable for Johnson’s conduct if it failed to take responsive action “reasonably calculated to end the harassment and reasonably likely to prevent the conduct from recurring.” Modern Cont’l/Obayashi v. Massachusetts Comm’n Against Discrimination, 445 Mass. 96, 100-10 (2005). Accord Marculetiu v. Safety Ins. Co. 98 Mass. App. Ct. 553, 569 n.19 (2020); Springfield v. United Pub. Serv. Employees Union, 89 Mass. App. Ct. 255, 261 (2016) (Title VII and Chapter 151B require employers to take prompt remedial action upon learning employee has been subjected to sexual harassment by non-supervisory coworker). The evidence of record in the instant case does not allow for such a finding.
“[T]he most significant immediate measure an employer can take in response to a [harassment] complaint is to launch a prompt investigation to determine whether the complaint is justified.” Walker v. Holyoke, 523 F. Supp. 2d 86, 109 (D. Mass. 2007) (quoting Swenson v. Potter, 271 F.3d 1184, 1193 (9th Cir. 2001)). “As long as the investigation is not ‘rigged to reach a pre-determined conclusion or otherwise conducted in bad faith,’ it may constitute a substantial step towards discharging the employer’s legal duty.” Id. (quoting Swenson, 271 F.3d at 1193). Here, McCauley conducted a prompt, fair, and thorough investigation of Downey’s allegations.  McCauley thus searched Johnson’s office, analyzed Johnson’s computer and web activity, reviewed the physical evidence submitted by Downey, and interviewed Downey and Johnson themselves (the former in the presence of her legal counsel).

-31-

Downey nonetheless argues that McCauley “engaged in stereotypical thinking” about Downey’s motivations for accessing the EHD, insofar as McCauley concluded that Downey’s disclosures placed her “in the unenviable position of having to then account for her own actions in accessing a device that clearly did not belong to her, and disclose intimate details of a failed personal relationship with a coworker.” Plaintiff argues that McCauley thus invoked sexist tropes about women being “possessive, jealous girlfriends,” and points out that there was no evidence that Downey lacked permission to use the EHD. These arguments are unpersuasive.
There is nothing in McCauley’s statement implying that Downey searched Johnson’s EHD because she was jealous and/or possessive, rather than to retrieve training materials as she claimed. McCauley included the statement at issue in a paragraph of her report that was clearly intended to underscore Downey’s credibility, by highlighting how difficult it must have been for her to come forward with what she had learned about Johnson.[19] McCauley’s stated empathy for Downey’s personal circumstances, and her overriding focus on Johnson’s rather than Downey’s conduct throughout her investigation, reflect that McCauley treated Downey as an individual rather than a stereotype. Moreover, while it is true that there was no evidence Downey lacked permission to access Johnson’s EHD, it is not clear that the EHD is even the “device” to which McCauley was referring in that paragraph, where McCauley also conducted an extensive inquiry into Downey’s examination of the desktop computer in Johnson’s office. The Court thus finds that there is no evidence to suggest that McCauley acted in bad faith or was otherwise gender

-32-

-biased against Downey in her investigation. Compare Gyulakian, 475 Mass. at 303 (jury could find investigation was inadequate where investigator admitted “to carrying a bias against the plaintiff,” never contacted plaintiff during the course of his investigation, and failed to corroborate plaintiff’s allegations in the face of reliable documentary evidence).[20]
Further to the foregoing, the Court observes that Johnson was moved out of the SPA during the investigation’s pendency in order to ensure Downey’s workplace comfort,[21] and was eventually disciplined for the violations of MSP workplace policy he was found to have committed. That discipline included a formal written reprimand for IT-related offenses, and a transfer out of the SPA where he had been working for years. Downey may well have wished that McCauley’s investigation had substantiated further evidence of misconduct by Johnson (e.g., the use of prostitutes, trysting with women at hotels during work hours, and the like); but these were matters that did not impact Downey herself in any employment-related sense. What affected Downey at work was Johnson’s careless use of MSP IT equipment, and the storing of inappropriate images on it that could potentially be accessed by police colleagues. Johnson was properly reprimanded for this behavior, and punished with a reassignment out of the SPA. No more was required by way of corrective response. 
“The chief measure of adequacy of an employer’s response is not the victim’s own personal sense of justice, but rather—particularly where there is no prior history of workplace

-33-

harassment—whether the behavior that gave rise to the complaint has ceased and does not threaten to reoccur.” Walker, 523 F. Supp. at 109 (quoting Cerqueira v. Corning Net Optix, U.S. Dist. LEXIS 17308, at *20 (D. Mass. 2004)). See also Walton v. Johnson & Johnson Servs., 347 F.3d 1272, 1288 (11th Cir. 2003) (“where the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow.”). There is no suggestion anywhere in the record here that Johnson ever again committed any of the kind of misconduct toward Downey (or anyone else) uncovered during the McCauley investigation, and Downey never complained of any.22 
Based on the foregoing, no reasonable jury could conclude that MSP failed to adequately investigate Downey’s allegations and thereby “passively tolerate[d] the creation of a hostile working environment” or “implicitly ratifie[d]” Johnson’s conduct. Salvi, 67 Mass. App. Ct. at 606 (quoting Modern Cont’l/Obayashi, 445 Mass. at 105). Rather, the undisputed evidence, viewed in the light most favorable to Downey, demonstrates that MSP reasonably investigated and fully remediated the conduct about which she had complained. Accordingly, MSP cannot be liable for Johnson’s conduct as a matter of law. See Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 420-21 (8th Cir. 2010) (affirming summary judgment for employer on plaintiff’s sexual harassment claim where employer promptly responded to plaintiff’s complaint, investigated her concerns, and transferred co-worker to another department, thereby ending his harassment of plaintiff); Messina v. Araserve, Inc., 906 F. Supp. 34, 37-38 (D. Mass. 1995) (“[T]he effect of adequate remediation on employer liability for sexual harassment committed by a co-worker under Chapter 151B is the same as under Title VII: it is a bar to liability.”). MSP’s

-34-

 Motion for Summary Judgment must, therefore, be allowed insofar as Downey seeks to impose vicarious liability on MSP for Johnson’s behavior.
ii. Disparate Treatment
The second component of Downey’s discrimination claim rests upon the allegation that she was subjected to disparate treatment, which occurs when an employer “‘purposefully uses’ [an employee’s] protected status in making its employment decisions.” Porio v. Department of Revenue, 80 Mass. App. Ct. 57, 61 (2011) (quoting School Comm. of Braintree v. Massachusetts Comm’n Against Discrimination, 377 Mass. 424, 428 (1979)). In support of this claim, Downey contends that she received more serious discipline than her male colleagues in connection with the Taser incident, and for submitting outside her immediate chain of command a complaint about the rumor that she was in a relationship with Lieutenant Colonel Grenham.
Where, as here, there is no direct evidence of discrimination, disparate treatment claims asserted under Chapter 151B and Title VII are analyzed under the three-stage, burden-shifting framework outlined by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See, e.g., Yee, 481 Mass. at 294 (applying McDonnell Douglas framework to discrimination claim asserted under G.L. c. 151B); Taite v. Bridgewater State Univ., Bd. Of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (applying McDonnell Douglas framework to discrimination claim asserted under Title VII). “Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of . . . discrimination.” Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 128 (1997). In the second stage, the burden shifts to the employer to rebut the presumption of unlawful discrimination by articulating “a lawful reason or reasons for its employment decision [and] produc[ing] credible evidence to show that the reason or reasons advanced were the real reasons.” Abramian v. President & Fellows of Harvard

-35-

College, 432 Mass. 107, 116 (2000) (quoting Wheelock College v. Massachusetts Comm’n Against Discrimination, 371 Mass. 130, 138 (1976)). Once the employer meets its burden of production, the burden shifts back to the plaintiff to demonstrate that the proffered reasons are not true, but are in fact pretextual. Abramian, 432 Mass. at 117.  
a. Prima Facie Case
Starting with the first stage of analysis, the Court considers what Downey must show to establish a prima facie case of discrimination. “[T]he essential elements of a prima facie case necessarily vary depending on the job involved and the decision to be made.” Smith College v. Massachusetts Comm’n Against Discrimination, 376 Mass. 221, 230 (1978). The majority of reported disparate treatment cases in Massachusetts, as well as the cases cited in Downey’s memorandum, concern allegedly discriminatory discharges or failures to hire, and thus identify elements of a prima facie case that do not apply here. See, e.g., Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441 (1995) (prima facie case requires showing that “(1) [the employee] is a member of a class protected by [Chapter 151B]; (2) he performed his job at an acceptable level; (3) he was terminated; and (4) his employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff’s.”). Based on the most applicable precedents, the Court finds that, to establish her prima facie case of discrimination, Downey must show that: (1) she was a member of a protected group, (2) she was subjected to an adverse employment action, and (3) the adverse employment action was more severe than that administered to similarly situated male co-workers. See Molloy v. Blanchard, 115 F.3d 86, 91 (1st Cir. 1997) (jury could have found female police officers established prima facie case by showing they had received harsher discipline than “similarly situated” male officers). The Defendants do not dispute that Downey is a member of a protected class, but argue in the first

-36-

instance that she cannot make out her prima facie case because she was not subjected to an adverse employment action. The Court does not agree.
An adverse employment action is one that “constitute[s] a change in working conditions that ‘create a material disadvantage in the plaintiff’s employment.’” Ritchie v. Department of State Police, 60 Mass. App. Ct. 655, 665 (2004) (citation omitted). “Cases have employed the phrase ‘adverse employment action’ to refer to the effects on working terms, conditions or privileges that are material . . . as opposed to those effects that are trivial . . . .” King v. Boston, 71 Mass. App. Ct. 460, 468 (2008). “Material disadvantage for this purpose arises when objective aspects of the work environment are affected. There must be ‘real harm’; ‘subjective feelings of disappointment and disillusionment’ will not suffice.” Id. (quoting MacCormack v. Boston Edison Co., 423 Mass. 652, 663-64 (1996)). “Because we focus on a reasonable person in the employee’s position, we examine whether an employee has suffered an ‘adverse employment action’ on a case-by-case basis.” Yee, 481 Mass. at 297 (quoting King, 71 Mass. App. Ct. at 470). For example, “[a] lateral transfer from an evening to a day shift may be an adverse employment action to one employee, but be welcomed by another.” Id.
Here, Downey contends that she was subjected to adverse employment actions when    (1) she received a written reprimand and was reassigned out of the SPA to patrol duty in connection with the Taser incident, and (2) she received a negative supervisory report for submitting a complaint about the alleged Grenham relationship rumor outside her chain of command. Downey argues that critical supervisory reports can have a negative effect on a trooper’s job prospects, but has failed demonstrate that the negative supervisory report that she received did, in fact, carry any tangible consequences that materially disadvantaged her. See Bhatti v. Trustees of Boston Univ., 659 F.3d 64, 73 (1st Cir. 2011) (a reprimand may constitute

-38

an adverse action if it carries a “tangible consequence” and was not issued merely to “correct[] some workplace behavior”). Compare O’Brien v. Massachusetts Inst. of Tech., 82 Mass. App. Ct. 905, 909 (2012) (holding that a reasonable jury could find that numerous written warnings issued to plaintiff constituted adverse employment actions for purposes of Chapter 151B). In the present case, Downey has failed to establish that the negative supervisory report she received carried any tangible consequences qualifying the report as an adverse employment action.[23] There were no such tangible job consequences here, a fact reinforced by Downey’s ensuing history of promotional advancement within MSP.  Plaintiff’s failure of proof in this regard entitles MSP to judgment as a matter of law on Downey’s disparate treatment claim, insofar as such claim is based on the treatment she received relative to Johnson for submitting a complaint outside her chain of command.[24]
Downey’s written reprimand and reassignment, however, stand on different footing. Unlike the negative supervisory report, the written reprimand did carry a tangible consequence insofar it was issued in connection with Downey’s job reassignment. There is scant evidence in the record exploring the differences between the working terms and conditions of SPA instructors and patrol troopers. Nevertheless, it seems reasonable to infer that SPA instructors who spend their days in a single location interacting with aspiring state troopers enjoy more autonomy and face fewer job-related hazards than patrol troopers tasked with maintaining order

-38-

and responding to the unpredictable demands of the street. See King, 71 Mass. App. Ct. at 468 (material changes to working terms and conditions may constitute adverse employment action). Cf. Yee, 481 Mass. at 299 (quoting Beyer v. County of Nassau, 524 F.3d 150, 165 (2d Cir. 2008)) (“To satisfy the element of an adverse employment action in the prima facie case, it suffices that an employee who is denied a lateral transfer puts forward evidence of any ‘objective indicator of desirability’ that would ‘permit a reasonable factfinder to conclude that the sought for position is materially more advantageous.’”). Compare Trinh v. Gentle Commn’s, LLC, 71 Mass. App. Ct. 368, 374-75 (2008) (transfer did not constitute adverse employment action where plaintiff’s responsibilities at new location were “substantially the same”).[25] Viewing the undisputed evidence in the light most favorable to Downey, a reasonable jury could find that her written reprimand and reassignment out of the SPA constituted adverse employment actions.
The final element Downey must establish to make out her prima facie case of discrimination is that the adverse employment actions to which she was subjected were more harsh than the disciplinary actions administered to another person, referred to in the case law as a comparator, “who was not a member of her protected class, but who otherwise was ‘similarly situated.’” Trustees of Health & Hospitals of Boston, Inc. v. Massachusetts Comm’n Against Discrimination, 449 Mass. 675, 682 (2007) (quoting Matthews, 426 Mass. at 129). “The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent . . . In other words, apples should be compared to apples.” Id. (quoting Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989)). To that end, “the plaintiff must provide evidence that the proposed comparators are not just similar in some respects, but

-39-

similarly-situated in all respects” with respect to the adverse employment decision. Spencer v. Virginia State Univ., 919 F.3d 199, 207 (4th Cir. 2019) (internal quotation marks omitted). Factors relevant to similarly-situatedness include whether the plaintiff and the putative comparator held the same job description, have comparable experience and qualifications, “‘have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.’” Rodriques v. Delta Airlines, Inc., 644 Fed. Appx. 629, 634 (2016) (quoting Ercegovich v. Goodyear Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)). Accord Matthews, 426 Mass. at 129 (circumstances of comparator employees must be “substantially similar” in “all relevant respects”).  As will be explained below, Downey has failed to establish that the individuals she points to as comparators for purposes of challenging the Taser-related discipline she received, viz., Wohlgemuth, Lahair, and Johnson, were similarly situated to her “in all relevant aspects.”
The most significant difference between Downey and her male colleagues is that Downey was the only one found to have discharged her Taser at an unprepared colleague. Although Downey points a finger at two co-workers who purportedly encouraged and helped her in this “prank,” it is undisputed that the preponderant evidence before the MSP was to the contrary. Wohlgemuth and Lahair emphatically denied any knowing involvement in the prank, and MSP’s investigator and ultimate decision-makers had no obligation to credit the contrary (and otherwise uncorroborated) accusation of one against the denial of two.[26] See EEOC v. CRST Van Expedited, Inc., 611 F. Supp. 2d 918, 955 (N.D. Iowa 2009) (“While the court must assume all

-40-

of the [complainants’] allegations to be true for purposes of Rule 56, it does not follow that [their employer] [was] required to have done the same . . . .”). Plaintiff’s counsel acknowledged at hearing that whether and to what extent Wohlgemuth and Lahair were involved in the Taser episode was, in fact, a matter of stark dispute during McCauley’s investigation. The inconclusiveness of the evidence implicating these employees in Downey’s uncontested wrongdoing plainly distinguishes their circumstances; and MSP’s decision not to impose formal discipline on co-employees who were not definitively determined to have engaged in like misconduct cannot give rise to a claim of disparate treatment of the similarly situated.
Downey nevertheless points out that MSP found that Wohlgemuth and Lahair had committed wrongdoing in relation to the Taser incident, insofar as they failed to report the incident to departmental management. Downey’s reliance on these findings is misplaced. Although a proposed comparator’s offense “need not be identical, the offenses must be of comparable seriousness. Employees are not similarly situated where one is disciplined pursuant to one policy and then seeks to be compared to coworkers who were not subject to that policy      . . . .” Matthews, 426 Mass. at 130 (citation omitted). See also Trahan v. Wayfair Me., LLC, 957 F.3d 54, 63 (1st Cir. 2020) (comparator evidence insufficient where plaintiff’s “misconduct was far more blameworthy than that of any co-worker she identified”); Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 260 (5th Cir. 2009) (“If the difference between the plaintiff’s conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis.”) (emphasis in original) (internal quotation marks omitted). The Court here finds that, wholly apart from the inconclusiveness of the evidence of knowing participation in the Taser prank as to Wohlgemuth and Lahair, there are clearly “differentiating or mitigating

-41-

circumstances” that distinguish their conduct from that of Downey. These differences preclude the Court from comparing their relative treatment “in a meaningful way.” Smith v. Stratus Computer, 40 F.3d 11, 17 (1st Cir. 1994) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)); see also Daumont-Colón v. Cooperativa de Ahorro y Crédito de Caguas, 982 F.3d 20, 28-29 (1st Cir. 2020) (“Material distinctions between  . . . two sets of circumstances increase the danger that any . . . inference [of discrimination] would amount to no more than mere speculation”). Here, the undisputed evidence presented to Pivero was that Downey had deliberately fired her Taser weapon at an unprepared and unprotected co-worker. Wohlgemuth and Lahair’s failure to report the episode to MSP management cannot rationally be equated to this in culpability.   
In view of the fact that Wohlgemuth and Lahair were not determined to have engaged in misconduct of comparable seriousness to that committed by Downey, together with MSP’s supportable conclusion that these co-workers were witnesses to rather than participants in the Taser incident, neither Wohlgemuth’s nor Lahair’s circumstances were objectively similar to Downey’s.[27] See Trustees of Health & Hospitals of Boston, Inc., 449 Mass. at 682; Richards v. Wilkie, 2020 U.S. Dist. Lexis 177187, at *66-67 (N.D. Ill. 2020) (plaintiff’s discipline could not constitute disparate treatment where charges of misconduct against comparators were not sustained). Plaintiff’s prima facie case of discriminatory discipline thus fails as a matter of law. 
Downey’s companion contention that the fact that the discipline she received for the Taser incident was equivalent to the discipline Johnson received for bringing pornography into work permits an inference of discrimination can also be quickly disposed of; for Johnson and

-42-

Downey were in this regard not similarly situated in any relevant respect. See Smith, 40 F.3d at 17 (quoting Dartmouth Review, 889 F.2d at 19) (“In a disparate treatment case, the plaintiff has the burden of showing that she was treated differently from ‘persons situated similarly’ in all relevant aspects.’”) (emphasis in original). Not only are “[t]he improper use of physical force . . . and sexual harassment . . . qualitatively different infractions[,]” Conward v. Cambridge Sch. Comm., 171 F.3d 12, 21 (1st Cir. 1999); there was no evidence whatsoever that Johnson intended for anyone to discover his pornography. By contrast, it is undisputed that Downey acted deliberately when she fired her Taser at Johnson. Such material differences in intent plainly distinguish their relative culpability and discipline-worthiness.
For these reasons, the Court finds that Downey has failed to show that the adverse employment actions to which she was subjected by MSP were more severe than those administered to similarly situated male colleagues. Downey has thus failed to establish a prima facie case of discrimination under Title VII and Chapter 151B.
b. Justification and Pretext[28]
Assuming Downey had established a prima facie case, a proposition the Court has rejected, MSP could rebut the presumption of discrimination “by articulating a legitimate, nondiscriminatory reason” for its decision to treat her differently than her male colleagues. Brooks v. Peabody & Arnold, LLP, 71 Mass. App. Ct. 46, 51 (2008). “[A]n employer must not only give a lawful reason or reasons for its employment decision but also must produce credible evidence to show that the reason or reasons advanced were the real reasons.” Id. (quoting Wheelock College, 371 Mass. at 138.) “The employer does not have to persuade the trier of fact

-43-

that it was correct in its belief.” Tate v. Department of Mental Health, 419 Mass. 356, 362 (1995).
Here, the Defendants have asserted that Downey was treated more severely than her male colleagues relative to the Taser incident, because MSP concluded that she was the only employee who had deployed her Taser against a vulnerable colleague. MSP has additionally satisfied its burden of production by submitting a copy of Johnson’s complaint, transcripts of Pivero’s witness interviews, a copy of Pivero’s findings, copies of Downey’s supervisor’s reviews of Pivero’s findings, a transcript of the proceedings before the Trial Board, and copies of the MSP’s ultimate findings related to the Trial Board proceedings. 
To establish that the MSP’s reason is pretextual, Downey must offer evidence “sufficient to convince a reasonable jury” that it was “not the real reason[]” for treating her differently, “thereby inviting the inference that discrimination was the motivating reason.” Yee, 481 Mass. at 302. Downey attempts to do this by challenging MSP’s underlying finding that Wohlgemuth and Lahair were not involved in the Taser incident. Inasmuch as the issue at the heart of Plaintiff’s claim is whether MSP was motivated by a discriminatory animus or bias, it is not enough for Downey to show that its findings were incorrect or insufficiently supported. Rather, Downey must establish that MSP did not hold a sincere belief in its finding that she was the only employee responsible for the Taser incident. See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 682 (2016) (quoting Wheelock College, 371 Mass. at 139) (“To survive a motion for summary judgment, the plaintiff need only present evidence from which a reasonable jury could infer that ‘the respondent’s facially proper reasons given for its action against him were not the real reasons for that action.’”); Sol v. Genzyme Corp., 2010 Mass. App. Unpub. LEXIS 351, at *10-11 (2010) (decision pursuant to Rule 1:28) (citing Smith College, 376 Mass. at 232) (to

-44-

survive summary judgment on issue of pretext, it was “not enough for [plaintiff] to deny the misconduct attributed to him or show that the decisionmakers . . . may have acted on incorrect perceptions[;]” he was instead “required to show that [his employer] disbelieved the accuracy of the nondiscriminatory reasons underlying their decisions to take adverse actions against him”). 
In the case at bar, there is no evidence that reasonably sustains the Plaintiff’s burden in this respect. First, Downey’s own testimony to the Trial Board that Lahair was not involved in planning the Taser prank belies any suggestion that MSP did not sincerely believe Lahair was not responsible for the incident. As for Wohlgemuth, Downey attempts to show that MSP did not sincerely believe Wohlgemuth lacked responsibility for the Taser incident by arguing that his claimed lack of involvement permitted only one conclusion: viz., that Downey stole one of the cartridges he had altered without knowing that it had been tampered with, and only fortuitously chose to deploy that cartridge, rather than a live one, at Johnson. Downey contends that MSP ratified this unlikely sequence of events by crediting Wohlgemuth’s statement over hers, and that its sheer implausibility creates an issue of fact as to whether MSP sincerely believed Wohlgemuth’s claims. The Court does not agree.
As set forth ante, Pivero permissibly concluded that it was impossible to determine whether Downey had even used one of the cartridges Wohlgemuth had broken the prongs off of, as opposed to an intact inert cartridge that merely had its blue cap swapped out for a black one. Pivero likewise provided a reasoned analysis as to why she found Wohlgemuth more credible than Downey, citing Wohlgemuth’s candor when he was asked whether he had altered Taser cartridges, the fact that he provided a plausible explanation for doing so,[29] and noting that the process of altering the cartridges took a considerable amount of time (implying that Wohlgemuth

-45-

would be unlikely to expend such effort on a co-worker’s prank). Pivero also observed that Wohlgemuth’s account was consistent with Lahair’s in this regard, and with the statements of Johnson and Lahair that Johnson had not pointed his Taser at Downey; whereas Downey’s contrary (and self-serving) account was entirely uncorroborated. See Leite v. Department of Youth Servs., 2016 Mass. App. Unpub. LEXIS 322, at *11 (2016) (decision pursuant to Rule 1:28) (no facts from which inference of pretext could be drawn where terminated employee “failed to identify any material omissions” in employer’s investigation; and employer was “warranted in crediting” third party witness’s statement over terminated employee’s because witness’s account was corroborated by other evidence). These findings are amply supported by both the transcripts of Wohlgemuth’s, Lahair’s, and Downey’s interviews with Pivero, and by their corroborating Trial Board testimony as well.
Even viewing the evidence in the light most favorable to Downey (which an investigating employer is not required to do) does not change the fact that the preponderant information before the MSP reasonably supported its finding that the evidence of Wohlgemuth’s and Lahair’s complicity in the Taser prank was inconclusive. See supra. Downey has thus failed to identify a genuinely disputed issue of fact as to whether MSP sincerely believed that Wohlgemuth and Lahair were not involved in the prank. An inference of pretext will not lie in these circumstances. See Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 56 (2005) (even if plaintiff was correct that employer selected her for layoff based on an unreliable assessment, “our task is not to evaluate the soundness of [the employer’s] decision making, but to ensure it does not mask discriminatory animus.”); Brandt v. Fitzpatrick, 957 F.3d 67, 78 (1st Cir. 2020) (quoting Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 48-49 (1st Cir. 2019)) (“[T]o survive summary judgment, ‘[i]t is not enough for [a plaintiff] merely to impugn the veracity of the employer’s justification’

-46-

or to point to flaws in [the employer’s] investigation.”); see also Brooks, 71 Mass. App. Ct. at 52. 
Downey alternately argues that other circumstantial evidence demonstrates that MSP’s decision to discipline her was rooted in discriminatory bias. See Lipchitz v. Raytheon, 434 Mass. 493, 504 (2001) (circumstantial evidence may satisfy plaintiff’s burden to prove employer acted with discriminatory intent). First, Downey contends that MSP investigated her complaints about Johnson’s pornography and about the Grenham rumor less thoroughly than it investigated Johnson’s complaint about her. This argument lacks merit. The record discloses, and the Court has already determined, that MSP conducted a fair, thorough and more than adequate investigation of Downey’s complaint about Johnson. The manner in which MSP investigated Downey’s complaint about the Grenham rumor was likewise fully thorough and adequate, particularly in view of Downey’s failure to provide MSP with anything more than a hypothesis as to who may be involved in starting and spreading the claimed rumor. Downey does not cite any established procedures or policies that MSP failed to follow in response to her complaints (and that it did follow in response to Johnson’s), and no such deviations are apparent in the record. Compare Bulwer, 473 Mass. at 687 (quoting Nesbitt v. Holder, 966 F. Supp. 2d 52, 56 (D.D.C. 2013)) (“A ‘failure to follow established procedures or criteria’ . . . [may] support a reasonable inference of intentional discrimination.’”). Plaintiff’s naked accusation of a difference in investigative thoroughness borne of sex bias cannot be credited in the Court’s assessment of summary judgment. See Flesner, 410 Mass. at 818 (plaintiff’s “unsupported statement of belief   . . . insufficient to survive a summary judgment motion”); Metelus v. Wingate Healthcare, Inc., 2015 Mass. App. Unpub. LEXIS , at *5-6 (2015) (decision pursuant to Rule 1:28) (citing Sullivan, 444 Mass. at 40) (plaintiffs’ “unsupported assertion” about employer’s conduct

-47-

 insufficient to defeat summary judgment); Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 72 (1st Cir. 2015) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)) (“[E]ven in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.”).
Downey additionally argues that there is evidence of a “sexist culture” at MSP. In support, Downey cites Johnson’s pornography collection, McCauley’s failure to condemn Johnson’s alleged practice of objectifying women, and Johnson’s arguably stereotypical claims that Downey was “prone to erratic behavior, such as mood swings, emotional outbursts, and verbal arguments.” Assuming, arguendo, that this evidence is, in fact, illustrative of certain sexist attitudes within MSP, there is no evidence that Johnson or McCauley had decision-making authority in connection with the Taser incident. Their putative biases, therefore, are of no moment. See Thompson v. Coca-Cola Co., 522 F.3d 168, 178 (1st Cir. 2008) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990)) (“[T]he biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.”). Compare Verdrager, 474 Mass. at 399-400 (stereotypical thinking by “plaintiff’s evaluators and supervisors” may show pretext). Plaintiff relatedly contends that the fact that Pivero asked Johnson to explain his claims about Downey’s behavior somehow suggests that Pivero has a sexist mentality. Not so. Pivero asked Johnson to explain his claims about Downey’s behavior because he had asserted them in the complaint she was then investigating. Questioning Johnson about these claims in no way endorsed them, and may simply have even been an effort by Pivero to assess Johnson’s credibility. Plaintiff presents no probative evidence (beyond speculation) to the contrary.

-48-

Based on the foregoing, the Court concludes that Downey has failed to place in legitimate dispute the sincerity of MSP’s belief that Downey engaged in serious misconduct that her male colleagues’ did not. MSP’s Motion for Summary Judgment, therefore, shall be allowed as to Downey’s discrimination claim insofar as it contends MSP subjected her to disparate treatment in discipline.
B. Retaliation (Count II)
The Court last turns to Downey’s claim that Johnson and MSP retaliated against her for filing a sex-related complaint against Johnson. To survive the Defendants’ motions for summary judgment on her retaliation claim, Downey must show that she: (1) engaged in protected conduct; (2) suffered an adverse action; “and [3] that ‘a causal connection existed between the protected conduct and the adverse action.’” Mole v. University of Massachusetts, 442 Mass. 582, 591-92 (2004) (citing Mesnick v. General Elec. Co., 950 F.2d 816, 827 (1991)). As discussed ante, Downey has already established that she suffered an adverse employment action when she was reassigned and issued a written reprimand in connection with the Taser incident. The Court thus limits its analysis to the first and third elements of a retaliation claim.
i. Protected Conduct
Protected conduct encompasses efforts to “oppose[] any practices forbidden” under Chapter 151B, see G.L. c. 151B, § 4(4), and may include “complaining to management or filing an internal complaint of harassment, or meeting with co-workers to discuss how to stop sexual harassment in the workplace.” Ritchie v. Department of State Police, 60 Mass. App. Ct. 655, 664 (2004) (quotation omitted). While “merely lobbing a vague charge of discrimination at an employer will not suffice[,] an accusation need not be lodged with absolute formality, clarity, or precision.” Crawford v. Chipotle Mexican Grill, Inc., 773 Fed. Appx. 822, 828 (6th Cir. 2019)

-49-

 (internal citations and quotation marks omitted); Demers v. Adams Homes of Northwest Fla., Inc., 321 Fed. Appx. 847, 852 (11th Cir. 2009) (“[T]o engage in protected activity, the employee must still, at the very least, communicate her belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred.”) (internal quotation marks and citation omitted).
In the present case, Downey avers that she engaged in protected conduct when she filed her complaint against Johnson for bringing pornography into the workplace. For Downey’s complaint to constitute protected activity, she is not required to show that Johnson’s conduct was, in fact, unlawful, but “only that . . . she had a good faith, reasonable belief” that the conduct she was complaining about was prohibited by civil rights laws. See Collazo v. Bristol-Myers Squibb Mfg., 617 F.3d 39, 48 (1st Cir. 2010) (internal quotation marks omitted). Downey cannot do so here, however, where she specifically eschewed the opportunity to file a sexual harassment complaint pursuant to MSP’s sexual harassment policy, admitted under oath that she did not feel sexually harassed by Johnson at the time she complained about him, and only advanced an allegation of sexual harassment in litigation after being advised of the “legal definition” of sexual harassment as inclusive of a hostile environment. See Samuels v. Correctional Med. Servs., 591 Fed. Appx. 475, 485 (6th Cir. 2015) (noting plaintiff’s failure to tell supervisor that she was feeling harassed or discriminated against during meeting about plaintiff’s complaint among reasons complaint was not protected activity); Orton-Bell v. Indiana, 759 F.3d 768, 776 (7th Cir. 2014) (employee’s complaint that other employees were having sex on her desk was not protected activity, where nothing in complaint “indicated that she was complaining of sex discrimination”). The record here reveals that Downey’s declared intentions in lodging her complaint were not to protest sexual harassment on Johnson’s part, but rather to protect others

-50-

 from Johnson’s proclivities and herself from criticism for failing to report his conduct in the event MSP eventually discovered it. Such intentions do not implicate the anti-retaliation protections of Title VII and Chapter 151B. See, e.g., Equal Employment Opportunity Comm’n v. Concentra Health Servs., Inc., 496 F.3d 733, 775-77 (7th Cir. 2007) (employee’s complaint that supervisor was having sex with subordinate not protected activity where employee’s concern was not that the sexual relationship was harassment, but that his boss was “favoring a paramour”). Downey also purports to have been concerned about Johnson’s mental health, his potential suicidality, and about her own reputation as Johnson’s romantic partner should co-workers in the SPA come to learn of his risky sexual behaviors. Once again, therefore, the substance of Downey’s complaint failed to explicitly or implicitly communicate a belief that Johnson’s conduct constituted unlawful sexual harassment. See Carson v. Metropolitan Atlanta Rapid Transit Auth., 572 Fed. Appx. 964, 969 (11th Cir. 2014) (complaint only constitutes protected activity if individual implicitly or explicitly communicates a belief that conduct at issue is unlawful); Willoughby v. Allstate Ins. Co., 104 Fed. Appx. 528, 530-31 (6th Cir. 2004) (plaintiff failed to demonstrate he engaged in protected activity where letter to employer appeared to be an effort to impeach his supervisor’s credibility as opposed to a complaint about unequal treatment). Cf. Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir. 1989) (employee’s submission of letter to employer asserting that coworker was racially intolerant was too “vague . . . to constitute opposition to an unlawful employment practice”).
Further to the above, and as the Court has discussed ante, it is well established that “isolated incidents (unless extremely serious) will not amount to discriminatory changes in the ‘terms and conditions of employment[]’” forbidden by Title VII or Chapter 151B.  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (quoting Faragher, 524 U.S. at 788). No

-51-

 reasonable person in Downey’s position could have believed in good faith that a one-time discovery of pornography on a co-worker’s personal hard drive constituted unlawful sex discrimination or harassment.[30] See Clark Cnty Sch. Dist., 532 U.S. at 271 (employee’s complaint about coworkers’ sexually suggestive banter was not protected conduct where “[n]o reasonable person could have believed” that the banter, which the plaintiff had only witnessed on a single occasion, violated Title VII). Compare Rodrick v. St. Joseph College, 2008 U.S. Dist. LEXIS 35985, at *18-19 (N.D. Ind. 2008) (employee’s complaint about coworker openly viewing pornography in her presence constituted protected activity). Accordingly, Downey’s complaint about Johnson was not the type of protected conduct that may serve as the predicate for a retaliation claim under Chapter 151B and Title VII. 
ii. Causal Connection
Even if Downey’s internal complaint did constitute a form of statutorily protected activity, Downey cannot establish a causal relationship between her complaint and an adverse employment action visited upon her by MSP. “[A] plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.” Theidon v. Harvard Univ., 948 F.3d 477, 506 (1st Cir. 2020) (quoting University of Texas Southwest Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013)); Brandt, 957 F.3d at 81 (“Unlike with a status-based discrimination claim, a plaintiff alleging retaliation can’t rely on a mixed-motives theory; he must show but-for causation[.]”) (internal quotation marks omitted). Chapter 151B, in turn, requires the plaintiff to show that “the employer’s desire to retaliate against the employee . . . [was] a determinative factor in its decision to take action.” Psy-Ed Corp. v. Klein, 459 Mass. 697, 707 (2011). “A cause is the determinative cause if it was

-52-

the active efficient cause in bringing about the adverse employment action.” Lipchitz, 424 Mass. at 505 n.19.
Here, while there is certainly evidence that Johnson’s complaint about the Taser incident was the product of a retaliatory motive on his part, Downey’s written reprimand and reassignment were not imposed by Johnson.[31] These job actions were, rather, handed down by Downey’s MSP superiors. Therefore, to impose liability on MSP, Downey must invoke the “cat’s paw” theory of retaliation recovery, and present evidence that Johnson used Downey’s MSP supervisors as “dupe[s] in a deliberate scheme to bring about an adverse employment action.” Thomas v. Berry Plastics Corp., 803 F.3d 510, 514-15 (10th Cir. 2015); Weeks v. Lower Pioneer Valley Educ. Collaborative, 2016 U.S. Dist. LEXIS 20467, at *41 (D. Mass. 2016) (quoting Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 86 (1st Cir. 2004)) (under the “cat’s paw” theory, “liability can attach when neutral decisionmakers rely on information that is manipulated by another employee who harbors illegitimate animus”). To that end, and as acknowledged by Plaintiff’s counsel at hearing, Downey relies solely on the fact that Johnson initiated the MSP investigation that led to her disciplinary action. As will be explained below, this evidence is insufficient as a matter of law to attach retaliation liability in light of MSP’s independent and taint-free review of Johnson’s claims.
Chapter 151B and Title VII permit an employer to “‘break the causal chain’ between the biased subordinate’s unlawful actions and the adverse employment action by independently investigating the allegations against the employee.” Thomas, 803 F.3d at 516; Mole, 442 Mass. at 598-99 (“Despite a retaliatory or discriminatory motive on the part of a supervisor who recommends that some adverse action be taken against an employee, a third person’s

-53-

independent decision to take adverse action breaks the causal connection between the supervisor’s retaliatory or discriminatory animus and the adverse action.”). Here, MSP was fully aware of Johnson’s potentially retaliatory motive, and carefully considered whether it had been manipulated by such motive before concluding that discipline against Downey was warranted.  In the end, and as Major Otte and the MSP explicitly found, the disciplining of Downey was entirely justified by the actions of Downey herself, regardless of any retaliatory relish Johnson may have taken in seeing this occur. See Roberts v. Randstad N. Am., Inc., 231 Fed. Appx. 890, 895 (11th Cir. 2007) (to survive summary judgment, plaintiff must show that employer did not conduct independent investigation, and acted in accordance with recommendation of non-decision maker who harbored a discriminatory animus against plaintiff). 
In the case at bar, MSP was unquestionably going to discipline Downey for firing a Taser at a co-worker, regardless of how it came to learn of this misconduct. Downey’s actions were conclusively proven (she admitted them), and were undeniably deserving of discipline for the very reasons Major Otte articulated in his summary (which recites in explicit terms why Johnson’s retaliatory motive did not operate to excuse Downey from the consequences of her misconduct). Plaintiff has presented no facts to suggest that Pivero, the Trial Board, or the MSP supervisors who reviewed their findings regarding the Taser incident did not thoughtfully consider the evidence or were somehow biased against Downey. See Thomas, 803 F.3d at 517 (employer’s review process “broke the causal chain” between co-worker’s retaliatory animus and employer’s adverse action, where there was no evidence that review “was a sham” or that anyone on the review panel “acted with animus”).
Thus, even if Johnson’s retaliatory motive sparked the process that led to Downey’s discipline, such tainted motive cannot be imputed to MSP for liability purposes when the

-54-

uncontroverted evidence shows that this employer conducted an independent review of Downey’s conduct and would have made the same decision even in the absence of Johnson’s impermissible contribution. See Macon v. UPS, 743 F.3d 708, 715 (10th Cir. 2014) (although co-worker initiated process leading to plaintiff’s termination, coworker’s retaliatory motive could not be imputed to employer when final decision to terminate plaintiff was made after an independent review of plaintiff’s conduct).[32] Downey has, in these circumstances, failed to establish a genuine issue of fact as to whether her complaint about Johnson was the “but for” or determinative cause of her discipline. Her retaliation claim thus fails as a matter of law. See supra.
To the extent Downey seeks to assign liability to Johnson individually for retaliation, she can only do so under a theory of “aiding and abetting.” See G.L. c. 151B, § 4(5) (making it unlawful for “any person, whether an employer or an employee or not, to aid [or] abet . . . the doing of any of the acts forbidden under [G. L. c. 151B] or to attempt to do so.”). However, aiding and abetting claims here are “entirely derivative” of the retaliation claim. See Lopez v. Commonwealth, 463 Mass. 696, 713 (2012) (quoting Abramian, 432 Mass. at 122). As set forth above, Downey has failed to establish a viable claim of retaliation. Plaintiff thus cannot sustain a claim for aiding and abetting retaliation against Johnson, and summary judgment against the claim shall be allowed.

-55-

CONCLUSION AND ORDER
For all the foregoing reasons, the Defendants’ Motions for Summary Judgment
shall be, and hereby are, ALLOWED.

SO ORDERED.

@/s/Robert B. Gordon Justice of the Superior Court

@October 1, 2021

footnotes

[1] The following facts are drawn from the parties’ joint Statement of Facts and the supporting discovery materials referenced therein, which have been filed in accordance with Superior Court Rule 9A(b)(5). These facts are presented in the light most favorable to the Plaintiff, as Rule 56 requires. 

[2] Downey later told an investigator that the EHD was organized into “lists of lots of different folders,” and that the explicit materials she had discovered were contained within a single folder. Downey did not recall what the folder was named. Downey reported that, in addition to pornographic image and video files, the folder contained sub-folders labeled “tits” and “pussy,” and a sub-folder labeled with Downey’s initials that contained non-pornographic images of her.

[3]Johnson later told an investigator that his suggestion he might be a sex addict was a “spontaneous utterance” he made in an effort to get Downey to stop “demanding answers” from him.

[4] References to “to/from” letters appear throughout the summary judgment record in relation to formal correspondence between MSP employees and supervisors. Such “to/from” letters are on MSP letterhead, and the first few lines of the letter identify whom the correspondence is addressed to, who it is from, and the subject matter of the letter.

[5] Downey acknowledges that Johnson had not intended for her to discover the materials stored on his iPad and EHD, and further testified during deposition that she did not—at that time—feel that she had been “sexually harassed.” In an affidavit prepared and filed in connection with her opposition to summary judgment, however, Downey clarified that, given the effect Johnson’s behaviors had had upon her at work, and having since been educated about the “legal definition” of sexual harassment, she now believed that Johnson had in fact created a sexually hostile environment for her at the SPA. Downey did not identify the source of her legal education. But given that Downey retained her current counsel shortly after the initial phone call with McCauley, and the fact that said counsel was present during Downey’s ensuing interviews with McCauley (where Downey conveyed what she had learned about Johnson), it is curious why Downey was not aware of the “legal definition” of sexual harassment in time to raise the matter of a purportedly hostile environment prior to the completion of McCauley’s investigation.

[6] During his interview with McCauley, Johnson stated that he had worked a 7:00 a.m. to 3:00 p.m. shift on the day in question, and Downey told McCauley that she “wasn’t sure” if Johnson had met up with the woman “on work time or not, just based on his schedule for that day.” McCauley did not, however, ask Johnson (or the Days Inn) to furnish her with registration information from the hotel; nor did she interview other troopers on duty that day who might have shed light on Johnson’s whereabouts. Either inquiry might have allowed the time-line of Johnson’s activities on May 31st to be filled in more completely, such that a determination could be made as to whether or not he had collected MSP pay under false pretenses. 

[7] Once again, however, the Court observes that there is no evidence in the record that Downey or any SPA colleague ever made such an accusation prior to the commencement of the instant litigation. Indeed, during her own deposition, Downey testified that she did not feel that she had been sexually harassed by Johnson at the time she brought her complaint forward to MSP. Likewise, the record contains no evidence that any employee other than Downey ever observed Johnson’s stored pornography, or otherwise experienced discomfort of any kind from his behavior in the workplace.

[8] A “drive stun” occurs when a Taser is activated, causing electricity to arc at the end, and the device is then “driven” directly against a person’s body. When drive stun mode is used, no barbs are deployed from the Taser.

[9]Downey also told Pivero that she did not believe pranking Johnson was Wohlgemuth’s “sole purpose” for altering the cartridges, and that she thought he might have been trying to come up with a “different kind of training cartridge” that would not require the use of protective suits. However, during her later deposition in connection with the instant lawsuit, Downey testified that, “as far as [she] knew,” Wohlgemuth had altered the cartridge “only for prank purposes.”

[10] During a subsequent hearing before the MSP Trial Board, Wohlgemuth testified that, when he reassembled the cartridges, he replaced the same blue cap he had removed to access the probes. Downey, by contrast, told Pivero and the Trial Board that Wohlgemuth swapped out the blue caps that were originally on the cartridges for black ones, so that the cartridge appeared to be live. 

[11]Pivero interviewed Wohlgemuth twice. During the first interview, which was conducted before Pivero interviewed Downey, Wohlgemuth did not mention the altered cartridges. Pivero called Wohlgemuth back for a second interview after she interviewed Downey, however, and asked him explicitly whether he had altered any cartridges. This inquiry drew Wohlgemuth’s explanation.

[12] At the time, Johnson was still in an intimate relationship with Downey in which they frequently shared a residence. Downey reports that Johnson never mentioned anything about bruises caused by the Taser episode, and she observed none on his body. 

[13] MSP’s Workplace Violence Policy defines “workplace violence” as “intimidation or threats communicated by any means; physical assault and/or battery; threats and/or acts of intimidation communicated by any means that cause an employee to be in fear of their own safety; and disruptive or aggressive behavior that causes a reasonable person to be in fear of their own safety or that of a colleague or that causes the disruption of workplace productivity.”

[14] The record reflects some dispute as to whether Captain Moran’s findings were ever memorialized in a written report, as he testified believing to be the case. The Court does not regard the issue as material. 

[15] Downey contested this charge, because Colonel McKeon and Lieutenant Colonel Hughes were, in fact, in her upstream chain of command. She did not, however, dispute that she had failed to address her complaint to the most immediate level of supervision above her, as MSP regulations evidently required.

[16] Although Downey asserts claims under both Title VII and Chapter 151B, she does not argue that the two claims should be analyzed differently. See Ponte v. Steelcase Inc., 741 F.3d 310, 319 n.9 (1st Cir. 2014) (acknowledging that the same legal standard applies to claims for hostile work environment brought under Title VII and Chapter 151B). The Court nonetheless points out that the Supreme Judicial Court has at least arguably interpreted G.L. c. 151B “to provide more protection . . . than Title VII, in part because of the Legislature’s direction that c. 151B is to be applied liberally.” Yee v. Massachusetts State Police, 481 Mass. 290, 299 (2019) (emphasis in original). 

[17] During oral argument on September 8, 2021, Downey’s counsel forthrightly conceded that, had the EHD  not traveled from the residence Downey and Johnson shared to the MSP workplace, there would be no nexus whatsoever between any alleged discriminatory conduct by Johnson and Downey’s work environment (and thus no viable harassment claim under Title VII or Chapter 151B).

[18] Plaintiff emphasizes that Johnson’s EHD was a piece of equipment to which he knew that Downey and other SPA employees had access. True enough. But these colleagues were not subjected to Johnson’s private pornography and other sexual predilections against their will, as the cases suggest is required to qualify as unlawful harassment. To access the offending images, SPA employees would have had to do what Downey undeniably did in this case – viz., open up electronic folders that were unambiguously labeled as personal and not work-related in nature. Johnson may well have been foolish (or worse) to allow such snooping to occur, but that is not sexual harassment.

[19] The paragraph states in full, that:
“Trooper Downey has been a veteran state police officer for almost twelve years. She was requested to submit a written account of the incident in this matter and prepared a lengthy and well written report containing all the details of what she had discovered. The circumstances were obviously shocking and distressing for her on a personal level. She was interviewed over two days and her candid disclosures and the circumstances of this incident put her in the unenviable position of having to then account for her own actions in accessing a device that clearly did not belong to her, and disclose intimate details of a failed personal relationship with a coworker.”

[20] Cf. Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky, 474 Mass. 382, 400 (2016) (supervisor’s comments that plaintiff did “not have a high ‘level of commitment to her professional development and interest in advancement and was more concerned about somehow . . . potentially pursuing a [discrimination] claim,’” together with emails sent to plaintiff when she was pregnant questioning her “commitment to her work . . . . could be understood to reflect a stereotypical view of women as not committed to their work because of family responsibilities”) (citation omitted).

[21] Compare Salvi v. Suffolk Cnty. Sheriff’s Dep’t, 67 Mass. App. Ct. 596, 606 (2006) (jury could reasonably find employer liable for harassment where management continued to give plaintiff undesirable assignments “involving periodic contact” with employees he had accused of harassment).

[22]Although Downey later speculated that Johnson may have been the source of a rumor that she was sexually involved with Grenham, a more senior MSP officer in her chain of command, there was no evidence found to support this charge despite a diligent investigation of it by MSP. Plaintiff has cited none to the Court.

[23] It is worth noting that if Downey had established that the negative supervisory report was an adverse employment action, the fact that it was eventually removed from her personnel file would not preclude liability against MSP. See Baez v. Brockton, 2017 U.S. Dist. LEXIS 214366, at *9 (D. Mass. 2017) (employers “who have subjected an employee to adverse employment action with discriminatory intent” cannot avoid sanctions by “nullifying the adverse employment action at a later date”).

[24] The Court further observes that, for essentially the same misconduct of reporting a workplace matter outside the MSP chain of command, Johnson received a formal letter of reprimand. This was a far more serious form of discipline than the supervisory report issued to Downey, differential treatment that Plaintiff does not ascribe to gender bias against Johnson.

[25] The fact that Downey subsequently received three rank promotions and is poised to be elevated to Captain shortly does not immunize MSP from the consequences of any discriminatory adverse employment actions it imposed on Downey before she was promoted. See Abraham v. Potter, 494 F. Supp. 2d 141, 149 (D. Conn. 2007) (rejecting defendant’s argument that employment action could not be adverse because “there was no lasting effect” on the plaintiff).

[26] It is also worth noting that, during her hearing before the Trial Board, Downey herself conceded that Lahair “didn’t have any part of actually planning [the prank] or anything.” And Downey’s description of Wohlgemuth’s role amounted to little more than a suggestion that discharging an inert Taser cartridge at Johnson would be funny and that he would like to observe it. Downey herself did the rest.

[27] Downey argues that MSP’s conclusions regarding the Taser incident were permeated by unlawful bias, and that unbiased decision-makers would have credited her assertion that Wohlgemuth and Lahair had also participated in the prank. The Court reserves its analysis of Downey’s arguments regarding MSP’s subjective reasons for treating her differently than her male colleagues for its discussion of pretext, infra. 

[28]Although Downey’s failure to establish her prima facie case is fatal to her claim of disparate treatment, the Court will address the final two stages of the McDonnell-Douglas framework in the interest of completeness.

[29] Downey herself acknowledged to Pivero that she did not believe Wohlgemuth’s “sole reason” for altering the cartridges was the prank.

[30] Indeed, Downey herself did not entertain such a view in real time.

[31] Johnson was a co-equal peer of Downey within the SPA, and had no authority of any kind to discipline her.

[32] At hearing, the Court posed the following analogous hypothetical: A bank teller reports to his branch manager that the bank should look at one of his fellow tellers, Jones, as the employee likely responsible for embezzling funds that had recently gone missing from one of the branch’s cash drawers. In making this accusation, the reporting employee explicitly asserts that a racial minority like Jones was not to be trusted around money. Notwithstanding the racist motivation underlying the reporting teller’s charge, the branch manager initiates an investigation and proceeds to discover the missing currency in Jones’ desk. Jones promptly confesses that he embezzled the funds so found, and the bank then discharges him from its employ. In these circumstances, and notwithstanding the racially discriminatory motive that prompted the teller’s original accusation that led to Jones’ discipline, Plaintiff’s counsel conceded that Jones could not properly bring a claim for retaliation under Title VII or Chapter 151B. The bank would ultimately have made the same disciplinary decision, wholly apart from the discriminatory accusation that set the investigative process which produced it in motion. Plaintiff acknowledges that such facts preclude the imposition of cat’s paw discrimination liability.       

xxz